**SIGNED.**

Dated: May 01, 2009

_____
**JAMES M. MARLAR**
**U.S. Bankruptcy Judge**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| TEMPE LAND COMPANY, LLC, | ) ) ) | No. 2:08-bk-17587-JMM |
| Debtor. | ) ) | **MEMORANDUM DECISION** |

  Before the court is the Debtor-in-Possession's (TLC's) motion to borrow money, on a priming basis, from EFO Finance Group, LLC (EFO) (Dkt. #151). A hearing was held on April 29 and 30, 2009, at which time the court heard evidence and considered the legal positions of the various parties.

  As the parties are familiar with the background facts, the court need not restate them, and will proceed directly to the issue before it.

  TLC proposes to borrow $7,978,435 from EFO. The ability of a debtor-in-possession (DIP) to borrow money, for reorganization purposes, is expressly authorized by the Bankruptcy Code. 11 U.S.C. § 364. In this case, TLC has asked the court to allow it to borrow, on a secured basis, and grant a lien to the new lender (EFO) which would be senior in priority to the other existing lienholders. The Bankruptcy Code allows this type of repositioning of secured debt. 11 U.S.C. § 364(d).

  However, in order to do so, the court must ensure that the existing senior, and soon to be junior lienholders are afforded "adequate protection" for their loss of seniority. § 364(d)(1).

In fact, in the face of objection by such senior participants, the court may grant such a request "only if " adequate protection is provided to the senior lienholders. § 364(d).

"Adequate protection" is defined in the Code as requiring either (1) cash or periodic payments equal to the lessening of a senior lienholder's position, or (2) an additional or replacement lien on property of value equivalent to the decrease in value of the primed position, or (3) affording the senior lienholder with something having the "indubitable equivalent" of the lessened position 11 U.S.C. § 361.

In the matter today, TLC has offered neither cash nor a replacement lien to the senior lienholders, and argues that a future corresponding increase to the liened property is the indubitable equivalent to the immediate loss to be realized by the lienholder, resulting from the insertion of a $7.9 million lien in front of them.

There is no question but that TLC has diligently labored, and searched the credit markets for new money to complete the project, in order to ready it for eventual sale or use. (*See* Ex. 3, 4.) It is also apparent, in the current economy, that DIP financing is not only difficult to find, but expensive. (*See, e.g.*, Ex. 26--Mortgages Ltd. 20% compounding interest rate, 10% origination fee; Ex. 2--TLC/EFO 14% interest, 4% origination fee.)

If approved, the current requested interim loan of $7.9 million will see only about $1.4 to $2.0 million actually used in the existing project. This is because lender costs, fees and reserves of approximately $1.7 million, a payoff of other loans of $2,750,00 to Stratera, another approximately $200,000 to pay off Magellan (Ex. 6,7,10), and a reserve for contingencies and reorganization expenses of $607,000, total about $5,257,000 of costs that do not directly improve the physical project.

Mr. Steven A. Klett testified, as an MAI appraiser, that the TLC unfinished projects have a current value of $34,600,000 (Ex. 20). He opined, with the approximate $2.0 million infusion directed into the project's construction from the EFO proposed loan, that within 60 days (July 1, 2009), the project's value would increase by $9.8 million. This is a predicted 28% increase in a 60-day period. Mr. Kenneth Loesch, the TLC representative, echoed these sentiments.

It is upon these predictions, and only those predictions, that TLC asks the court to find, as a factual matter, that the "indubitable equivalent" standard has been met. The court has no doubt as to the witnesses' sincerity, but in this economy, can sincerity or predictions satisfy the "indubitable equivalent" requirement?

Sections 361 and 364 are part of the Bankruptcy Reform Act of 1978, which became effective October 1, 1979. Happily, that Code was well thought out, well-drafted and well-documented with reliable legislative history. And, in the 30 years which have passed since its enactment, courts have followed Congress' balanced approach to the rights of both creditors and debtors. Even better, the recent, more inartfullly-crafted BAPCPA left §§ 361 and 364 untouched from the 1978 version. As a consequence, court decisions applying those sections are consistent and easily understood. " 'Indubitable' means 'too evident to be doubted.' " *See In re Arnold & Baker Farms*, 85 F.3d 1415, 1421 (9th Cir. 1996).

Here, the proposed TLC borrowing unnecessarily shifts the risk to the current secured creditors, who are asked to accept TLC's predictions of future success and projections for land appreciation in a market and economic climate which are today unsettled, depressed and turbulent.

"Indubitable equivalent" requires more than a prediction of success for a project that, sixty days from today, will still be in an unfinished condition, incapable of generating income, and in need of additional financing. The statute is clear. A court must not allow a secured creditor's legal position to be diminished in favor of a new lender, absent adequate protection. TLC's evidence is based only on opinions, which in this market and this economy are not reliable enough indicators to satisfy the "indubitable equivalent" standard.

In a request for a priming lien, a DIP bears the burden of proof. 11 U.S.C. § 364(d)(2). The difficulty of advocating for the substitution of an indubitable equivalent, upon only the predicted future appreciation of an asset, is magnified when the existing secured creditor is already admittedly undersecured. And, predictions of success are equally outweighed by predictions of failure, especially when the DIP is already in a bankruptcy proceeding.

From the evidence presented, the court is not persuaded, by a preponderance of the evidence, that the proposed DIP borrowing will increase the value of the project by an equivalent

3

or greater value than what the current secured lenders are being asked to give up. Nor is the court confident that TLC's evidence of a future increase in value was sufficiently credible, as it only represents an opinion or prediction as to what a future real estate market will likely be over the course of the next 60 days.

Much of the proposed new loan is earmarked for purposes that are not directly tied to necessary <u>construction</u>. Only about one-quarter to one-third of the borrowed funds are intended to be used for actual construction or physical improvement. The balance is slated for other purposes, such as lender fees, interest reserves and the payoff of other loans, none of which directly benefit the project.

In addition, the current uncertainty in Arizona's real estate market does not bode well for future predictions of value, especially in the short term. Sincere as the parties and witnesses might be as to their opinions of future value to be brought to this project, the court is not left with a confidence that priming the current secured creditors' liens will give them the "indubitable equivalent" of what they are being forced to relinquish. 11 U.S.C. § 361.

Thus, the court can answer each of the questions posed by the parties in the joint statement of issues:

1. Will the EFO Loan provide adequate protection to the lienholders that will be primed:
    a. Will the funding of the DIP Loan on the terms set forth in the Agreement result in any diminution in the value of the existing lienholders' interests in the Collateral? **ANSWER: YES**
    b. Will the funding of the DIP Loan enhance the value of the Collateral by an amount greater than the amount of the DIP Loan? **ANSWER: NO**
2. May the EFO Loan proceeds be used to pay up to $2.75 MM to Mortgages Limited to satisfy the "Stratera" Loan? **ANSWER: MOOT**

3. May the EFO Loan proceeds be used to pay certain "soft costs" included in the budget, including Debtor's attorneys' fees, repayment of the affiliate DIP loan and certain other items? **ANSWER: MOOT**

TLC's motion to borrow, on a priming basis, will therefore be DENIED. A separate order will be entered. FED. R. BANKR. P. 9021.

DATED AND SIGNED ABOVE.

COPIES served as indicated below on the
date signed above:

Steven N. Berger Engelman and Kevin Judiscak
Engelman Berger
3636 N. Central Ave., Suite 700
Phoenix, AZ 85012
Email: snb@engelmanberger.com
Email: kmj@engelmanberger.com
Attorneys for Debtor

Renee Sandler Shamblin and Larry Lee Watson
Office of the U.S. Trustee
230 N. First Ave., Suite 204
Phoenix, AZ 85003-1706
Email: renee.s.shamblin@usdoj.gov
Email: larry.watson@usdoj.gov

Keith L. Hendricks
Fennemore Craig
3003 N. Central Ave., Suite 2600
Phoenix, AZ 85012
Email: khendricks@fclaw.com
Attorneys for Committee of Investors (Mortgages Ltd)

Bradley J Stevens and Todd B. Tuggle
Jennings Strouss
201 E. Washington St.
Phoenix, AZ 85004-2385
Email: bstevens@jsslaw.com
Email: ttuggle@jsslaw.com
Attorney for Mortgages Ltd

Jared G .Parker
DeConcini McDonald Yetwin & Lacy
7310 N. 16th St., Suite i330
Phoenix, AZ 85020
Email: jparker@dmylphx.com
Attorney for Trustee G. Grant Lyon, Trustee (Radical Bunny)

| | |
|---|---|
| 1 | Nancy Kalafa Swift<br>Buchalter Nemer |
| 2 | 16435 N. Scottsdale Rd., Suite 440<br>Scottsdale, AZ  85254-1754 |
| 3 | Email:  nswift@buchalter.com<br>Attorneys for General Electric Company |
| 4 | |
| 5 | Christopher C. Simpson<br>Stinson Morrison Hecker |
| 6 | 1850 N. Central Ave., Suite 2100<br>Phoenix, AZ  85004-4584 |
| 7 | Email: csimpson@stinson.com<br>Attorneys for Central Cabinet & Supply Co. |
| 8 | Jon S. Musial<br>Law Office of Jon S. Musial |
| 9 | 8230 E. Gray Rd.<br>Scottsdale, AZ 85260 |
| 10 | Email: jon.musial@azbar.org<br>Attorney for Performance Contracting, Inc. |
| 11 | |
| 12 | Richard M. Lorenzen<br>Perkins Coie Brown & Bain |
| 13 | 2901 N. Central Ave., Suite 2000<br>Phoenix, AZ 85012-2788 |
| 14 | Email: rlorenzen@perkinscoie.com<br>Attorney for Unsecured Creditors/Radical Bunny |
| 15 | Tamalyn E. Lewis<br>Ridenour, Hienton, Kelhoffer, & Lewis |
| 16 | 201 N. Central Ave., Suite 3300<br>Phoenix, AZ  85004 |
| 17 | Email:  telewis@rhkl-law.com<br>Attorneys for Heritage Interiors |
| 18 | |
| 19 | Jeffery M. Hall<br>Jeffery M. Hall, P.L.C. |
| 20 | P.O. Box 51955<br>Phoenix, AZ  85076-1955 |
| 21 | Email:  jmhall102755@cox.net<br>Attorney for Safeguard Security and Communications |
| 22 | Dominic Gomez<br>Ricker & Bustamante |
| 23 | 4530 E. Shea Blvd., Suite 150<br>Phoenix, AZ  85028 |
| 24 | Email:  dg@rblawoffice.com<br>Attorney for Schindler Elevator |
| 25 | |
| 26 | Don C. Fletcher<br>The Cavanagh Law Firm |
| 27 | 1850 N. Central Ave., Suite 2400<br>Phoenix, AZ  85004 |
| 28 | Email:  DFletcher@CavanaghLaw.com<br>Attorneys for EFO Financial Group |

Adam B. Decker
Jackson White
40 N. Center, Suite 200
Mesa, AZ 85201
Email: adecker@jacksonwhitelaw.com
Attorney for Farnsworth Wholesale Company

John R. Clemency
Greenberg Traurig
2375 E. Camelback Rd., Suite 700
Phoenix, AZ 85016-9000
Email: clemencyj@gtlaw.com
Attorneys for Stratera Protfolio Advisors

Brenda K. Martin
Osborn Maledon,
2929 N. Central Ave., 21st Floor
Phoenix, AZ 85012-2793
Email: bmartin@omlaw.com
Attorneys for Powers Steel & Wire Products, Inc

Mark J. Giunta
Law Office of Mark J. Giunta
1413 N. 3rd St.
Phoenix, AZ 85004-1612
Email: mark.giunta@azbar.org
Attorney for Hojaca Corporation


By  /s/ M.B. Thompson
        Judicial Assistant